226

THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, v.
DENNIS SCHMELZER WHITE, DEFENDANT AND APPEL-
LANT.

No. 10720.
Submitted May 12, 1965. Decided August 27, 1965.
Rehearing denied October 1, 1965.
405 P.2d 761.

228

John C. Hall (argued), P. J. Gilfeather, Great Falls, for appellant.

Gene B. Daly, County Atty., for Cascade County, Great Falls (argued), Charles M. Joslyn, Asst. Atty. Gen., Helena (argued), J. Fred Bourdeau, Chief Deputy County Atty., Cascade County, Great Falls, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from the District Court of the Eighth Judicial District of a judgment of conviction of first degree murder.

Dennis Schmelzer White, the appellant, a 16 year old defendant, was charged with first degree murder. Trial was had upon a plea of "not guilty" and the court entered a judgment of conviction on the jury's verdict of guilty. The defendant's motion for a new trial was denied, and this appeal was taken from the judgment and the denial of the motion for a new trial.

On the night of July 13-14, 1963, Godfrey Johnson and his wife, Alma Johnson, were bludgeoned in the bedroom of their home. The evidence indicated that the instrument used had a long narrow side which was considerably blunt and another side with a wide blunt surface and sharp edges. As a result

of these blows Godfrey Johnson died and Alma Johnson lost any recollection of the event.

The evidence showed that the Johnson house had been thoroughly ransacked. A pair of Godfrey Johnson's pants and underwear were found near a garage directly across an alley from the Johnson house. His wallet was found one block south of the house without any money in it.

On July 16, 1963, an ax was found one block west of the Johnson house. There were blood stains on the ax which were identified as human blood, type B, the same blood type as Godfrey Johnson's. Blood stains were also found throughout the Johnson house. All of these stains were human blood and could be identified as type B, except those found in front of the couch in the living room and those found in the bedroom of Leonard Johnson, the son of Godfrey and Alma.

On July 23, 1963, Dorothy Rothwell, Dennis White's grandmother, informed the County Attorney that she had overheard conversations between the defendant, Dennis White, and his mother. Mrs. Rothwell stated that on July 14, 1963, she overheard a conversation between her daughter, Dennis' mother, and Dennis White and testified as follows:

"A. * * * and I heard my daughter say something about washing off blood, 'I'm sorry,' she said, 'because I was up so late washing out blood.' And that kind of startled me, and then he said, 'Mom, you promised.' She said, 'Oh, Grandma wouldn't say anything.' So then later on he walked over by the door and I could see him. He was close enough to me so I could see him and he said, 'If he dies, they'll pick me up for murder.'"

"A. * * * My daughter said, 'If she dies it will be worse yet,' and he said, 'Oh, I only hit her twice, she'll be all right.' Then she said something about him, and he just shuddered. She said, 'Why did you do it?' and he said, 'I don't know, I had to.'"

Mrs. Rothwell testified that she again overheard a conversation between the defendant and his mother on July 21, 1963, which she related as follows:

"A. * * * My daughter made the statement that it was rumored that fingerprints were found on the ax, and she said it couldn't be, because he wiped the handle clean."

On the afternoon of the same day the defendant was requested by police officers to go to the County Attorney's office. He consented and was taken there by the officers. Here he was questioned by the County Attorney and a police officer and he admitted the murder. A court reporter was called in, the defendant repeated the statement and it was recorded by the reporter. In this recorded statement the defendant among other things admits: that on the night of July 13-14, 1963, he entered the home of Godfrey Johnson having an ax in his possession; that while he was going through dresser drawers and a pair of pants in a bedroom, Godfrey Johnson, who was in bed with his wife, awoke and startled him; that he hit Godfrey four times on the head and his wife twice with the blunt end of the ax; that he backed the Johnson car out of the garage and almost collided with a passing car; and that he threw Godfrey Johnson's pants by a brick garage, that he threw the wallet away also and "stashed" the ax in some bushes.

On trial a witness for the State testified that between 1:00 and 1:30 the night of the murder, a car which resembled the Johnson car came from the Johnson garage headed in a reverse direction and almost collided with his. And after a comparison of soil samples from where Mr. Johnson's pants were found, an F.B.I. laboratory expert testified that it was improbable that the soil taken from Dennis White's shoes came from any source other than where the pants were found.

On July 29, 1963, the district court appointed two experienced attorneys to defend Dennis White. These same two attorneys have also prosecuted this appeal on behalf of the defendant. The brief prepared by these attorneys, lists ten major specifications of error under which are set out by way of subheadings 108 separate allegations of error. In this opinion these

various specifications and allegations have been combined where practicable in the interest of being concise.

The defendant first attacks the admissibility of the confession. In this regard the defendant contends that he was not adequately advised of his constitutional rights. This court has searched the record and found that the defendant was advised of both his right to counsel and his right to remain silent. The record indicates that defendant was advised of these rights prior to confessing and shortly after the interrogation began. In this regard this case can be distinguished from the recent decision of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. In Escobedo the defendant was not effectively advised of his right to counsel and his right to remain silent, and further, his request to consult his lawyer was denied. In the case now before us, the defendant was advised of his rights and then voluntarily confessed. At no time during the interrogation did he request the assistance of counsel, even though asked. This court in State v. Robuck, 126 Mont. 302, 248 P.2d 817, stated that the fact the confession was procured in the absence of counsel does not affect its admissibility provided it was otherwise voluntarily given.

The defendant further attacked the admissibility of the confession on the ground that it was involuntarily given. The rule under the Fourteenth Amendment is that a confession is involuntary if the will of the accused is so overborne that his statement is not the product of a rational intellect and a free will. Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948; State v. Noble, 142 Mont. 284, 384 P.2d 504. The United States Supreme Court has held the admission of a confession into evidence in state courts to be violative of the due process clause of the Fourteenth Amendment in the following cases: where the confession was obtained by physical brutality (Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; where the defendant was subjected to 36 hours of unremitting interrogation (Ashcraft v. State of Tennessee, 322 U.S. 143, 64

S.Ct. 921, 88 L.Ed. 1192); where interrogating officers used threats against defendant's mother as well as long sustained periods of interrogation while the defendant was held incommunicado and denied the consultation of family or friends. (Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815); where an uneducated negro of low mentality was kept in isolation (Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246); where defendant was held for three days without access to family, friends or an attorney, and was threatened with mob violence (Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975); where officers used deceit and official pressure on a fatigued defendant (Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265); and where the evidence indicated the defendant was probably incompetent or insane at the time he confessed (Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242).

In finding the confession to be voluntary we searched the record for any circumstance or conduct or any combination thereof which in light of the above-cited United States Supreme Court decisions would render the confession inadmissible. The record contains no evidence of physical brutality, no evidence of mob violence or any threat thereof, no evidence of a prolonged interrogation, and no evidence of mental incompetency on the part of the accused. The record shows the period of interrogation was short—two to three hours, and that the accused is of average or above average intelligence.

The defendant alleges that while he was being interrogated he was threatened that if he didn't make a statement his mother would be institutionalized. An examination of the testimony of the defendant both at the hearing on the motion to suppress the confession and at trial reveals no such threat. The defendant did testify that he confessed out of fear that his mother would be placed in Warm Springs, but he did not testify this fear was the result of any threat in regard to his mother.

234

The defendant claims that the confession was obtained by subterfuge, objecting specifically to being asked at the interrogation what he would say if told his fingerprints were found on the ax. His reply to this question, according to the State, was that they couldn't be because he had wiped them off. This question did not bring any undue pressure to bear on the defendant, and the fact that he may have suffered a slip of the tongue does not establish coercion.

The age of a defendant minor, his education and his lack of previous experience with the law are also important factors to be considered in determining the voluntariness of a confession. The defendant here is 16 years old, is in the ninth grade and had no previous police record. However, these facts alone do not necessarily require the trial court to find the confession inadmissible.

It is also true that the defendant was without the advice or assistance of family or friend while he was being questioned. However, the defendant did not indicate he desired their presence. When defendant was requestd to go to the County Attorney's office he was asked if he wanted the officer to talk to his mother. He replied in the negative. After the defendant had orally confessed an officer went to his home, informed his mother of the confession and brought her back with him. She was denied access to the defendant until after the recorded statement was complete. After an examination of all the facts and circumstances surrounding this confession and giving full consideration to the decisions of the United States Supreme Court, this court has concluded, as did the trial court, that the confession of Dennis White was voluntary. The rule in this state is that the question of whether an alleged confession made while in custody is voluntary depends largely on the particular facts in each case; its admissibility in the first instance is a matter for the trial court's determination and its finding thereon will not be reversed on appeal unless clearly against

the weight of the evidence. State v. Rossell, 113 Mont. 457, 127 P.2d 379.

The defendant contends that the confession is not worthy of belief and that it is false. This fact he states is evidence that it is involuntary. The defendant's brief attempts to develop inconsistencies between the defendant's oral statements, his written statement, and facts established otherwise. Such "facts" as to how many times the deceased was struck, what the sequence of events in the fatal bedroom were, and others of like import are said to be inconsistent. We shall not develop this bit by bit but do observe that certain highlights of the statements overheard by Mrs. Rothwell, the near accident with the Johnson auto, and other matters are remarkably corroborated and borne out. However, it is established that the truth or falsity of a confession is not to be considered in determining its voluntariness. A defendant, under the Fourteenth Amendment, has a right to a fair hearing and a reliable determination of the voluntariness of a confession, not influenced by its truth or falsity. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

Defendant also contends the confession was inadmissible because there was unnecessary delay in taking him before a magistrate. Defendant was arraigned the day following his arrest. First, it should be pointed out that the rule of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, is not a constitutional restraint upon the states. Second, the law of this state must be determined and applied. State v. Nelson, 139 Mont. 180, 362 P.2d 224, provides that a confession is not rendered inadmissible solely by delay in taking the defendant before a magistrate, but such circumstances are important and should be given serious consideration by the court in determining whether the confession was voluntarily made. The admission of a confession is addressed to the discretion of the trial court (State v. Ratkovich, 111 Mont. 19, 105 P.2d 679), and we find nothing in the record to indicate the trial court abused its

discretion in this case. The defendant orally confessed within two or three hours after he was brought in for questioning. Later that evening his confession was recorded.

The defendant also makes objection to the procedure used to determine the voluntariness of the confession. Jackson v. Denno, supra, requires that state courts must first hear evidence regarding the confession outside the presence of the jury. The state court must then make a determination whether the purported confession was voluntary or involuntary. If the confession is found to be involuntary it may not be admitted into evidence. If it is found to be voluntary it may be admitted for consideration by the jury. The procedure used by the state district court in the present case meets the requirements of the Jackson case. There was a hearing outside the presence of the jury on the motion to suppress the confession. This was a complete hearing at which the defendant called and examined as witnesses the state officers who obtained his confession, the defendant, his mother, a psychiatrist and certain police officers. The district court's denial of this motion was, in effect, a determination that the confession was voluntary. The confession was then admitted into evidence and the jury was properly instructed that they must find the confession voluntary before they consider it.

The defendant's allegation in regard to the degree of proof necessary for the admission of a confession is that voluntariness must be established beyond a reasonable doubt. State v. Berberick, 38 Mont. 423, 100 P. 209, is cited by defendant to support this contention. The instruction given in the Berberick case (which is identical to instruction No. 43 given in this case) required that the jury find beyond a reasonable doubt that the confession was made. It did not establish any rule as to the degree of proof necessary to show a confession voluntary. The court now holds that before a confession may be admitted into evidence the state must show to the satisfaction

of the trial court that it was voluntary. (For examples of other tests see 23 C.J.S. Criminal Law § 837, p. 254.)

■ Defendant also specifies as error that he was not allowed to attack the credibility of Dorothy Rothwell, a witness for the State, by showing she suffered from delusions as to the sanity of her male relatives. However, the record shows Dr. White, a psychiatrist and witness for the defendant testified that Mrs. Rothwell was delusional as to her ex-husband, his family, and the descendants of the family. The delusions were that the male relatives, including the defendant, were destined to become violently insane at some time during their lives, especially during their teens. Thus the credibility of the witness as it related to her mental capacity was attacked and considered by the jury.

The instruction given on the impeachment of a witness who may have delusions is as follows:

"You are instructed that the credibility of a witness may be impeached by testimony showing or tending to show that such a witness may suffer from an impaired mind which impairment, if any may prevent the witness from accurately observing, recording, or relating passing events to which such witness testified."

■ This instruction, contrary to the contention of the defendant, covers both the question whether a witness can accurately record and relate passing events, and whether a witness had delusions of events which did not pass.

■ The defendant argues that he was not allowed to show bias, prejudice and the feelings of Mrs. Rothwell towards him. The record again shows the contrary. On cross-examination the testimony of Mrs. Rothwell is as follows:

"Q. (By Mr. Gilfeather) Is the family background the reason for you feeling that he is insane? A. No, not entirely. I know the boy is a good boy, and I know that he would never do anything like that unless he was out of his mind. And he

needs help, and that's my sole reason for wanting him to face up to this is so that he can get help."

The above-quoted testimony shows the witness' feelings toward the defendant and any bias or prejudice, if any existed, the witness had in regard to the defendant and his involvement in the crime.

The defendant's next specification of error concerns its efforts to impeach Ken Thomas, a witness who testified on behalf of the State. Thomas had testified that he had overheard a conversation between the defendant and two other boys on July 12, 1963. He stated that they said, "it would be a real nice house to do it in." Thomas testified that they were talking about a burglary of a home on a corner. The Johnson house is also on a corner.

On cross examination Thomas stated that he told the County Attorney's office that he and two other boys had siphoned gas in an area near the Johnson house on July 10, 1963. Thomas was then asked the following:

"Q. As a result of that statement, have you yourself been in any way proceeded against by any sort of action before the juvenile authorities?"

Objection to this question was sustained, whereupon the defendant made an offer of proof stating that the purpose of the question was to show bias, interest and concern of the witness in the outcome of the trial. The court ruled in favor of the state and the defendant now claims error. The case of State v. Ponthier, 136 Mont. 198, 346 P.2d 974, lays down the rule that the defendant should be permitted to test the credibility of witnesses for the State by subjecting such witness to a searching cross-examination as to any promise of immunity or leniency made to him. Such facts are relevant to show the interest of the witness in testifying, and reflect on his credibility. Such alleged errors may be the basis of a reversal of conviction only when they affect or prejudice the substantial rights of the defendant. (See R.C.M.1947, § 94-

8207.) After a thorough study of the transcript this court concluded that the defendant received a fair trial and was not prejudiced, even were we to consider the matter error.

The trial court also refused to allow the defendant to introduce into evidence certain F.B.I. reports containing information on fingerprints. The defendant again claims error. However, a stipulation between the State and defendant was read into the record, stating that two latent prints of value were found, one on the ax and the other in the Johnson home, and that neither of these prints are identical with the prints of the defendant. The matters contained in the F.B.I. reports were covered by the stipulation, and thus no prejudicial error could have resulted.

The defendant contends the evidence was insufficient to sustain the verdict. This specification of error is based on the assumption that the confession was inadmissible, therefore not evidence, and the remainder of the State's case was insufficient to convict. This court has already determined that the confession is admissible evidence so to this extent defendant's argument fails. The rule in this state is that if substantial evidence is found to support the verdict, it will stand. State v. Cor, 144 Mont. 323, 396 P.2d 86; State v. Peschon, 131 Mont. 330, 310 P.2d 591. In this case the confession together with the corroborative evidence and the testimony of Dorothy Rothwell, the testimony of Ken Thomas and the soil samples were more than ample to support the verdict of the jury.

The defendant's next specification of error is that the trial court failed to give instructions on circumstantial evidence. However, all the evidence introduced against the defendant is not circumstantial. And if any direct evidence is introduced it is not error to refuse circumstantial evidence instructions. State v. Bean, 135 Mont. 135, 337 P.2d 930. Direct evidence has been defined in Underhill's Criminal Evidence, 5th Ed., Vol. 1, Sec. 4, page 5 as follows:

"Direct evidence of the crime is the evidence of an eye wit-

240

ness that it was committed. This includes in criminal law the confessions and the admission of the accused and dying declaration."

This court now holds that, for the purpose of an instruction on circumstantial evidence, testimony of a confession is direct evidence, and it is not error to refuse to charge the jury on circumstantial evidence in such a case. This position has been adhered to in many jurisdictions. (For example, see Ledford v. State, 215 Ga. 799, 113 S.E.2d 628; Anderson v. State, 246 Miss. 821, 152 So.2d 702; State v. Tornquist, 254 Iowa 1135, 120 N.W.2d 483.)

The refusal of defendant's proposed instruction requiring that the State prove beyond a reasonable doubt that defendant was present at the time the crime was committed was not error. In State v. Bess, 60 Mont. 558, 199 P. 426, this court held that it was not error to refuse such an instruction if the defendant did not also tender an instruction defining the term alibi. However, our holding in this case will not be based on the Bess decision. Rather, in criminal cases the important question is whether the ruling of the trial court adversely affected the substantial rights of the defendant. A reading of all the instructions makes it clear that the jury must have fully understood that if they entertained a reasonable doubt as to whether the defendant was present at the time Godfrey Johnson was murdered, he must be acquitted. Therefore, no substantial error was committed by the rejection of such instruction.

The defendant claims the trial court erred in refusing to give the following instruction.

"You are instructed that declarations against interest given by an accused are the weakest and least satisfactory evidence in persuasive value."

However, the court did give the following instruction:

"You are instructed that the law of this state admonishes you to view with caution the testimony of any witness which

purports to relate to an oral confession or an oral admission of the defendant."

Again, looking to the substantial error rule it is the view of this court that the defendant's rights were not prejudiced by the refusal of his offered instructions on declarations against interest. The instruction given contains substantially what was said in the instruction offered by the defendant.

The defendant's remaining specification of error is in giving instruction No. 38. This instruction reads as follows:

"Evidence, if any, that the defendant, on one or more occasions other than from the witness stand, made false, contradictory or misleading statements concerning the charge against him which now is being tried may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given to such a circumstance, and the significance, if any, to be attached to it, are matters for the jury to determine."

The defendant's objection to this instruction is that there were no such statements. This is not so, since the defendant's admissions were made after he had denied knowledge. His own testimony reveals this. Therefore, there is no merit to this alleged error.

Subsequent to the filing of this appeal and subsequent to oral argument the defendant moved this court for an order granting leave to the district court to accept and entertain a motion for a new trial, and to stay further proceedings on appeal pending such motion, and for additional time to file the motion for a new trial. The defendant's motion was based on newly discovered evidence and supported by affidavits.

The so-called newly-discovered evidence consisted of a statement of Dorothy Rothwell, made on May 7, 1965, about one week before oral argument on this appeal. In a handwritten letter or note, Mrs. Rothwell states that, "at the time I testified I believed my testimony true. Since then I have had reason to

believe that in my state of mind I could have been, and perhaps was, mistaken."

She then made a statement in question and answer form, in part as follows:

"Q. You mention in this letter or statement which you have given me a conversation that you believe you may have overheard on July 21, 1963. A. Yes, I believe that I said at the time of trial that my daughter said Dennis had wiped the handle of the ax clean, but my son-in-law and daughter have no recollection of this conversation. Another incident was when I was visiting him in jail that he said something to me and I asked Mr. Daly to check it out to see if another person heard it. Mr. Daly said this person says that he never heard it although Dennis was talking loud enough for him to hear it. I feel that I should have gone to a lawyer to protect myself and the family and I did not know what to do.

"Q. Do you recall your testimony at the time of the trial regarding seeing an ax in Dennis's house in April, 1963? A. Yes, there was an ax in the house, not the same one though. I do not know just when it was I saw it.

"Q. And do you recall your testimony concerning a conversation in the White house on July 14, 1963? A. Yes.

"Q. Do you recall that conversation at this time? A. Yes, as far as I am able to remember they were talking about blood and Dennis said something to his mother about blood 'if he dies they will pick me up for murder,' she said 'If he dies it will be worse yet.' That's the way I saw it and heard it, or at least the way I thought I saw it and heard it at the time I testified. There was another incident in our family before that time about insanity—not me but my husband—to show you my state of mind at that time. He shot a man and Mr. Daly wouldn't bring it out, and I wanted Dr. White to declare me delusional so that I wouldn't have to testify, but he didn't, but I am not criticizing Mr. Daly because he had a job to do and he did what

he thought was right but Mr. Daly didn't want it brought out at the trial.

"Q. Now there was another incident which happened just recently that you mentioned to me before we started taking this statement. Would you tell me about it? A. Yes, I would. This happened in church. There was a lecture and the lecturer's name was announced and I was just sure the lecture was for May 9th. I was very positive that that was the date given but everybody else says that it was not for that day. I would stake my life that it was announced for the 9th of May. There was no lecture announced for our church on that Sun. when lectures were announced.

"Q. Now has this sort of thing ever happened before? A. Yes, it has, I become very confused, especially when I am down town, I am confused, I am very forgetful, I forget very easily.

"Q. What was your mental state at the time of trial? A. Prior to the time of trial I was confused and concerned by about my grandson. I felt that he was a very immature boy and that he might have been trapped into making a false confession and I feel I may have falsely helped to convict Dennis. Prior to trial I was afraid for him. Dennis came to my house or to where I was working and I went with him to a used car lot where we saw a man who seemed to be of very low character, underworld character and Dennis became very afraid and upset at seeing this man and I was afraid that he might have had some dealings with this man, may be selling narcotics or the like and I did not want him to associate with this underworld character. Now I am wondering if maybe my unconscious feeling of wanting to protect Dennis did not make me say what I did. I am still wrestling with myself as to whether I did hear the things I testified about or whether I only thought I heard them.

"Q. And as to the conversations that you testified to at the time of trial you are not sure if you heard them or not? A. I am not sure.

"Q. Do you have anything else you wish to add? A. I feel

that if Dennis had done this thing he should be put away for the good of society but I certainly don't want to be responsible for convicting him if he is innocent. I just don't want my family to resent me and feel the way they do about me because of it. I want to do what is right. I honestly thought that my testimony about what I heard was right, but maybe I was wrong, because I have been wrong before and I could be wrong now. I just don't know whether I heard those things or not."

We think any fair reading of what at first appears to be recanting testimony reveals it is not recanting at all. Mrs. Rothwell, grandmother of a convicted murderer, has shown great fortitude and devotion to her family and her public duty. Doubtless she had and has emotional feelings beyond realization. Her expressions reveal family pressure and a realization of the enormity of her grandson's crime. We have great sympathy and respect for Mrs. Rothwell.

However, we have considered the motion and find no merit. It is therefore denied.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES DOYLE, ADAIR and JOHN CONWAY HARRISON concur.