No. 12593

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

_____

THE STATE OF MONTANA,

Plaintiff and Appellant,

-vs-

HAROLD BRYAN SMITH,

Defendant and Respondent.

_____

Appeal from: District Court of the Second Judicial District,
Honorable James D. Freebourn, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
Thomas J. Beers, Assistant Attorney General, argued,
Helena, Montana
Larry Stimatz, County Attorney, Butte, Montana
Brian Tierney, Deputy County Attorney, argued,
Butte, Montana

For Respondent:

Maurice F. Hennessey argued and Gary Winston argued,
Butte, Montana

_____

Submitted: February 25, 1974

Decided: MAY 2 4 1974

Filed: MAY 2 4 1974

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The State appeals from the granting of a motion to suppress evidence in a murder case. We hold the order to suppress was in part erroneous.

On May 14, 1972, at 4:47 p.m., the Butte police department was called to investigate a homicide at the home of Harold Bryan Smith, defendant. Smith and his wife had been separated for several months. He had taken a room elsewhere while the family continued to live at the residence to which the police were called. Upon their arrival about 5:15 p.m., defendant Smith and one Stewart, a friend of Smith's, were present. The body of Smith's wife, Vicci, was found in an upper bedroom of the house.

Thereafter, the sequence of events is complicated and disputed. At the hearing to suppress evidence, Chief of Police Russell testified he took Smith downstairs to the living room about 5:30 to 5:45 p.m., read him the warning required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L Ed 2d 694, and a waiver of those rights, from a card which he carried for that express purpose. That card was admitted into evidence at the suppression hearing. Chief Russell testified he knew Smith well for he, Smith, was an employee of the city. Russell stated he particularly stressed, prior to Smith making any statements, that Smith had a right to an attorney. Further, although Smith was upset and crying, he seemed to understand the warning and waiver, and at no time did Smith ask for an attorney. Detective Sgt. Mulcahy testified that while he was engaged in taking photographs of the bedroom, he heard Chief Russell tell Smith he was entitled to an attorney while Smith and Russell were standing at the head of the stairs, just prior to descending to the living room.

- 2 -

Shortly thereafter, Smith and Stewart were taken to the police station, arriving there between 6:45 and 6:50 p.m. Detective Lt. Sullivan testified he read Smith the Miranda warning and waiver from a card identical to Chief Russell's. That card was also before the court at the hearing. Lt. Sullivan testified the reading took place between 6:55 and 7:00 p.m. and, in his opinion, Smith understood and made an intelligent waiver of those rights. Lt. Sullivan testified the reading of the Miranda warning and waiver was recorded on a Sony casette recorder, after which a short coffee break was taken. When the interrogation resumed at 7:12 p.m., Deputy County Attorney Tierney backed the tape up and restarted it, which had the effect of erasing the reading of the Miranda warning and rights by Lt. Sullivan. Interrogation continued for about one hour or until approximately 8:10 p.m. These proceedings were recorded and transcribed in the county attorney's office and were introduced as defendant's exhibits "A" and "B". The essence of Smith's story up to this point was that he knew nothing whatever about his wife's death other than the discovery of her body.

It was at this point that Smith began to change his story. Also at this point, due to a shortage of casette tapes at the police station, the tape recorder was taken from the room where Smith was being interrogated and was used to interview the witness Stewart. When this occurred, Sgt. Mulcahy got his personal tape recorder and used it to record Smith's change in story. This segment was introduced as defendant's exhibit "B-1". It is relatively short. In it Smith confirmed that he had indeed been given the Miranda warning and waiver by Chief Russell at the home. Sgt. Mulcahy testified that subsequent to this he read Smith the Miranda warning and waiver from a form which the Butte police use for that purpose. The reading commenced at 8:32 p.m. and Smith signed the

- 3 -

form at 8:35 p.m. His signature was witnessed by Chief Russell and Sgt. Mulcahy. This form was introduced into the record as defendant's exhibit "C". Sgt. Mulcahy testified Smith knew and understood what he, Mulcahy, was saying. Sgt. Mulcahy testified the reading of the Miranda warning and waiver was recorded, however such reading does not appear in the tapes or transcript.

Immediately subsequent to the signing of the waiver form, Lt. Sullivan testified he read the Miranda warning and waiver to Smith from the top of a form entitled "Voluntary Statement", State's exhibit "C". Immediately below the printed warning Smith made a written statement. The statement was timed as completed at 8:55 p.m., signed by Smith, and his signature was witnessed by Lt. Sullivan, Sgt. Mulcahy and Deputy County Attorney Tierney. The written statement was admitted as defendant's exhibit "D".

Apparently while the statement was being written, the Stewart interview ended and the tape cassette was returned to the room where Smith was being interrogated. After Smith signed the statement at 8:55 p.m., the casette which had been used to record exhibits "A", "B", and the Stewart interview, was used to record the interrogation of Smith after he had signed the statement. That lasted from approximately 8:55 p.m. until 9:12 p.m. This transcription was admitted as defendant's exhibit "E".

Defendant was charged with second degree murder the next day. In due course motion was made to suppress all evidence, oral or tangible, obtained during the interrogation on May 14, 1972, and all evidence discovered subsequently as a result thereof. After a hearing the district court granted the motion. The State appeals that portion of the order suppressing the admission of defendant's exhibits "C", "D" and "E", that is, the signed waiver of rights, the statement and the tape and transcript of the interrogation taken after the signing of the written statement.

The issue is whether it was error for the court to suppress these exhibits as representing involuntary statements and admissions.

When a motion to suppress is presented to a trial court, its analysis of the evidence presented at the pretrial hearing must focus on whether impermissible procedures were followed by law enforcement authorities. The burden of proof of voluntariness is upon the State, and it is required to prove voluntariness by a preponderance of the evidence but not beyond a reasonable doubt. State v. White, 146 Mont. 226, 405 P.2d 761; State v. LaFreniere, ___Mont.___, 515 P.2d 76, 30 St.Rep. 882; Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L Ed 2d 618.

In this case the trial court made findings of fact, some of which upon review, we find erroneous. For the purposes of this opinion, we will set forth four of the/for our discussion.
findings

2. That the chief of police in a private interrogation psychologically coerced the defendant.

3. That the tape recordings and exhibits indicate that the defendant was not given his rights until he had been questioned for at least one hour and twenty minutes.

4. That the defendant signed a waiver of his rights form but was so emotionally distraught that he did not and could not have knowingly and intelligently waived his rights.

5. That the confession of the defendant was not voluntary.

We note that the trial court adopted the defendant's proposed findings of fact, noting in its order that they were adopted in their entirety. Finding No. 2 appears to this Court to be the basic finding and is premised on "psychologically coerced" testimony. This finding in turn serves the court in findings Nos. 4 and 5.

The rule in this state is that the question of whether an

alleged confession made while in custody is voluntary depends largely on the particular facts of each case; its admissibility in the first instance is a matter for the trial court's determination and its findings thereon will not be reversed on appeal unless clearly against the weight of evidence. State v. White, 146 Mont. 226, 405 P.2d 761; Couch v. U.S., 409 U.S. 322, 34 L Ed 2d 548, 93 S.Ct. 611; Procunier v. Atchley, 400 U.S. 446, 27 L Ed 2d 524, 91 S.Ct. 485; Sims v. Georgia, 389 U.S. 404, 19 L Ed 2d 634, 88 S.Ct. 523; Beecher v. Alabama, 389 U.S. 35, 19 L Ed 2d 35, 88 S.Ct. 189, 408 U.S. 234, 33 L Ed 2d 317, 92 S.Ct. 2284.

We think finding of fact No. 3 is not supported by substantial credible evidence. Smith stated that he was not given his Miranda warnings, or that he did not remember if they were given. Against these contradictory self-impeaching statements we have the testimony of two experienced police officers who testified that they did in fact read Smith the warnings. The cards from which the warnings were read were introduced into evidence. A third officer overheard Smith being asked if he wanted an attorney. Each of the officers testified that Smith understood and knowingly waived his rights. Each of the officers was thoroughly cross-examined, and in addition, all witnesses were excluded from the courtroom while others were testifying. Again to compare, Smith both admitted and denied, and on occasion could not remember if he were given the warnings. This self-impeaching, contradictory testimony does not amount to substantial credible testimony sufficient to uphold the finding of the trial court.

In the face of this testimony, we hold that a finding that Smith was not given his Miranda warnings is clearly against the weight of the evidence; hence we find that Smith did in fact receive an adequate Miranda warning prior to any interrogation whatever.

It must be noted in considering our holding that we are involved only with exhibits "C" and "D", for as will be immediately discussed, all tapes including exhibit "E" were properly excluded by the trial court.

Exhibit "C" is a waiver form signed at 8:32 p.m. in a detective's office at city hall. At the time he signed the waiver he had been in custody no more than 3 hours if the time were figured from the time of the arrival of police at the home. He had been at the police station no longer than 2 hours.

Exhibit "D" is the voluntary statement which also had a Miranda warning heading up the statement. It is handwritten and signed by Smith with a completion time of 8:55 p.m.

We will next consider the various tapes presented to the trial court as evidence. This Court in State v. Warwick, 158 Mont. 531, 542, 494 P.2d 627, sets the standards for admissibility of sound recordings. They are:

> "(1) a showing that the recording device was
> capable of taking testimony, (2) a showing that
> the operator of the device was competent, (3)
> establishment of authenticity and correctness
> of the recording, (4) a showing that changes,
> additions or deletions have not been made,
> (5) a showing of the manner of the preservation
> of the recording, (6) identification of the
> speakers * * *."

Our review indicates that the tapes wholly fail to meet the standards set above, hence they are inadmissible, and the trial court properly so held.

Insofar as defendant's exhibits "C" and "D" are concerned (the letters "C" and "D" are used both as state's and defendant's exhibits) we find that the trial court erred in excluding these exhibits. The so-called "psychological coercion" holding in the court's findings is not in our opinion present and controlling as to these exhibits. There is in White an excellent discussion of cases where the admissibility of a confession or admission was denied due to various types of coercion. None of the cases cited

can be considered similar factual situations. Here the questioning was not lengthy, there was no physical brutality in obtaining the confession, no long period of being held incommunicado or denied the consultation of friends or family, no uneducated minority, nor was there deceit or official pressure used on a fatigued individual. Rather, here we have an adult male who had been at police headquarters no longer than two hours making a statement concerning the crime. This same defendant called the police to his estranged wife's home inviting their inquiry. To strike that evidence because someone in the functional process of taking the statements on tape erred is not a reason to find for the accused. All the safeguards in the handling of an accused must be met, such as the rules of arrest, search and seizure, and the taking of admissions and confessions. Almost without exception law enforcement officials and prosecutors have accepted and strictly adhere to these rules. In our opinion there was an intelligent waiver of a known right by Smith at the time he signed exhibits "C" and "D" and they should be admitted at trial.

It is so ordered.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice Haswell and Mr. Justice Daly dissenting:

We dissent.

The statement of events surrounding the custodial interrogation of defendant set forth in the majority opinion is incomplete. There is contrary and conflicting evidence in the record supporting the findings of the district court that defendant did not consciously and intelligently waive his known and understood constitutional rights, that psychological coercion was present, and that defendant's written waiver and statement was involuntary.

For example, Lt. Sullivan testified that the interrogation continued after defendant said he wanted to remain silent and thereafter the purported waiver and signed written statement resulted:

> "Q. And isn't it a fact that after it was indicated to you and Chief Russell and Assistant Attorney, Brian Tierney, Mr. Smith thought that Mr. Tierney was representing him and after Mr. Smith said he wished to remain silent that you continued to interrogate him and came up with Exhibits C and D? A. Are you referring to this, I want to remain silent?
>
> "Q. Yes. After he said that, when the subsequent chain of events was there was a continued interrogation with C and D coming into being, isn't that correct? A. Could I explain?
>
> "Q. Well, it's either a fact that you did question or you didn't? A. Yes, I did, but I don't read that meaning into it.
>
> "Q. But you did continue to question? A. Yes."

Sgt. Mulcahy testified:

> "Q. In fact, he was upset and crying throughout the interrogation from listening to the tape was he not? A. Off and on.
>
> "Q. And would you say at any time that he could have been in shock like he was in a daze? A. Yes, sir. I wouldn't want to define shock, but I would say that at times he appeared to be in shock or dazed."

The Chief of Police testified that he told defendant that he didn't believe the story defendant was telling, and

- 9 -

that "if the truth was told that it would be easier on everybody, that we wouldn't have to bring his children into this thing and that, I did talk like that."

This testimony constitutes substantial credible evidence supporting the fact findings of the district judge and renders the waiver and written statement of the defendant inadmissible under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L Ed 2d 694.

We would affirm Judge Freebourn's order suppressing the evidence.

_____
Justice

_____
Justice