No. 14601

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

STATE OF MONTANA,

Plaintiff and Appellant,

-vs-

WAYNE LEE GRIMESTAD,

Defendant and Respondent.

_____

Appeal from:  District Court of the Eleventh Judicial District,
Honorable James M. Salansky, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Mike Greely, Attorney General, Helena, Montana
Ted O. Lympus argued, County Attorney, Kalispell, Montana

For Respondent:

Christian, McCurdy, Ingraham & Wold, Ronan, Montana
Frank L. Ingraham argued, Ronan, Montana

_____

Submitted: April 27, 1979

Decided: JUL 9 1979

Filed: JUL 3 1979

Thomas J. Kearney
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

The State of Montana appeals from an order of the District Court, Flathead County, granting defendant's motion to suppress evidence on the grounds that certain incrimination statements and admissions made by defendant were not voluntary.

On October 3, 1977, around 7:00 in the evening, officers of the Flathead County sheriff's department were summoned to the scene of a shooting near the Isaac Walton Inn outside of Essex, Montana, on Highway 2 East. Upon arrival, they encountered defendant Wayne Lee Grimestad waiting with a highway patrolman near defendant's pickup truck. In the cab of the pickup, curled on the floor face down and lying on the passenger's side with head pointing toward the driver's side, was the body of Gary Jewett, dead of a single bullet wound through the head. A .357 Magnum pistol belonging to the deceased was on the floor of the pickup under his body. One spent shell was found in the seat on the driver's side.

According to an investigative report filed by the officer in charge, defendant related the following circumstances when interviewed at the scene:

Defendant and Jewett had left Kalispell at noon that day on a fishing trip. They had stopped at several taverns during the course of the day and had also tarried once along the way to shoot Jewett's new pistol. They stopped at the Isaac Walton Inn, intending to have a drink, but found the bar closed. As they were returning to the pickup after finding they could not get into the bar, Jewett stopped in the lobby to talk to a young woman. Defendant waited in his pickup for three or four minutes and then returned to get Jewett to leave. Jewett continued his conversation. Defendant went back outside, sat waiting in the pickup another three or four minutes, and then fired the pistol

out the driver's side window into the tree tops, hoping to attract Jewett's attention. When Jewett still did not come, defendant returned once more to the lobby and demanded "Come on, let's go." This time Jewett accompanied defendant back to the pickup.

They had driven down the road and were approaching a stop sign at the highway when defendant heard a shot go off. Defendant turned to Jewett to admonish him about firing from a moving vehicle and saw him slumped over in his seat. Defendant stopped the pickup, flagged down a passing vehicle, and told the driver his partner had just shot himself. (Again, this scenario is as reported by the investigating officer from statements taken from defendant on the evening of the incident. The report is dated October 11, 1977, which means it was filed subsequent to an interview and a later polygraph exam administered to defendant which are the central events in this appeal.)

On October 4, 1977, the day following the shooting, defendant was at his parents' house where he was called on the telephone by the Flathead County sheriff's office. Defendant's mother answered the phone and relayed to him the message that the sheriff's office would like him to come down for more questioning. She contends that the caller assured her that the authorities were convinced the shooting incident was an accident and only wanted to clear up a few details. In fact, however, because of certain physical evidence (body position, gun position, and trajectory of the bullet), the sheriff's office felt that Jewett could not have been holding the pistol himself when the fatal shot was fired.

Defendant voluntarily went to the sheriff's office that afternoon and submitted to an interview. He was not accompanied by counsel. He was shown, read, and signed a Miranda rights form and waiver, which procedure was prefaced by one of the officers

- 3 -

saying: " . . . I don't want to freak you out with the thing, but just by our procedures and the way the courts go and everything, before we talk to anybody about virtually anything we have to advise them of their rights, and I don't want you to get all excited thinking we're accusing you of anything or we suspect you of anything or anything else, but that's part of the procedure."

The transcript of the interview on October 4 is of the same tenor as the statements from the investigative report concerning the evening of the incident. Defendant said the gun was sitting on the seat between him and the decedent when they left the Isaac Walton Inn. Both men had reached a point of intoxication where they were "pretty well along the road," but neither was incapacitated to any extreme. Defendant's truck had rounded a curve, was slowing for a stop sign, and the shot went off. Defendant said he did not see what happened.

The officers repeatedly suggested that the physical evidence indicated that the decedent could not have been holding the gun when it went off. They emphasized again and again that they were convinced that the shooting was no more than an unfortunate accident. They theorized that what occurred was that Jewett, who had a reputation as a hothead when drinking, was "messing with" the gun and defendant grabbed for it, causing it to fire. Defendant repeatedly stated that he did not recall any such occurrence. The officers insisted that the physical evidence did not match defendant's story. Defendant steadfastly maintained he was telling all he knew, that he was not really sure what happened, and that he had come to the interview hoping the sheriff's office could clarify it for him. The officers suggested a polygraph at a later date and defendant closed the interview by saying: "Well, if you need any help, like you said, take the test or whatever, I mean, I've got to find out for myself what happened."

Several days after this first interview, a sheriff's deputy again telephoned defendant at his parents' home. His mother again took the call. He was requested to come back to the sheriff's office for a polygraph examination. His mother said she asked the caller "Well, then maybe we should get a lawyer for Wayne," to which she stated the caller responded "What do you want a lawyer for unless you need one."

On October 8, 1977, pursuant to arrangements made by phone calls, defendant again voluntarily presented himself, again unrepresented by counsel, at the Flathead County sheriff's office. He was accompanied by his parents, who waited for him while he was privately subjected to a polygraph test by two officers. Apparently no tape or transcript was made of this second stationhouse interrogation; none appears in the record. The officers who administered the test maintained that the polygraph registered a negative response when defendant replied to the question "Did you deliberately shoot Gary Jewett?" They also maintained that during the course of the conversations on that day, defendant repudiated his earlier statements and recalled specific incriminating details of the shooting incident.

At the conclusion of the polygraph interview, the officers asked defendant to make a written statement embodying the substance of what he had told them. The original of that statement is not part of the record, and the copy is difficult to decipher. It appears to read as follows:

> "We stopped at the Isaac Walton to have a beer.
> the Bar was closed I was going to leave and Gary
> was talking to a girl. I said lets go. I went
> out in the pickup and waited. Look at his gun
> check to see if it was loaded it had only 1
> shell in it I looked around (undecipherable) shot
> it into a tree a woman was looking out a window
> then I went in to get gary. I went out to the
> pickup then gary came out he was saying something
> about Jim & Gordie then he said I'll show them I
> grab for the gun and it went off. Then I really
> don't remember much.
>
> After firing at the tree I reloaded the gun W.L.G."

Several matters by way of explanation and background of this written statement require comment. The reference to "Jim and Gordie" is to the deceased's two children. The last sentence appended to the end of the statement was added at the specific request of one of the interrogating officers. It is also noteworthy that defendant's parents maintained that after the polygraph interview, but while defendant was still isolated and apparently before he executed the written statement, one of the interrogating officers came out and told them: "I believe Wayne did it, but without a doubt it was an accident."

On November 21, 1977, a complaint was filed in Flathead County justice court charging defendant with deliberate homicide in the shooting death of Gary Jewett. A preliminary hearing was held before the Justice of the Peace. At the preliminary hearing, one of the officers who was present at the polygraph interview testified that defendant had stated during that conversation that, contrary to his previous statements, in actuality "the shooting had occurred directly in front of the Isaac Walton Hotel, that (defendant) remembered having the gun in his possession when it went off and he then backed away from the building, drove on down the road."

In all, five officers testified at the preliminary hearing, relating various facts set forth above and explaining from the results of their investigations why they concluded the dead man could not have been holding the gun himself when the fatal shot was fired. Based on that testimony, the justice of the peace concluded there was probable cause to bind the case over to District Court. Thereafter, defendant was formally charged by Information with deliberate homicide.

The motion to suppress evidence which has resulted in this appeal was filed on August 17, 1978. It requests suppression of all admissions or statements made by defendant on October 8, 1977,

the day of the polygraph examination and alleged repudiation of defendant's original version of the incident, on the grounds that those statements and admissions were not voluntary. An affidavit of defendant accompanying the motion states that he was informed by the Flathead County sheriff's department on that day that he did not need counsel; that the officers told him if he could not remember the circumstances of the shooting "he would have to be institutionalized because the State cannot have people running around loose who could not remember things"; that the officers suggested to defendant that certain events had probably transpired at the time of Jewett's death; and that the statements and admissions defendant made to the officers were the product of coercion and intimidation in that he was in fear of incarceration in a mental institution.

A hearing on defendant's motion to suppress was held in Flathead County District Court, commencing on September 15, 1978. Defendant testified, in summary, that he did not remember what had happened during the shooting incident and that any oral admissions he had made on the day of the polygraph examination were in the context of statements to the effect that "If you say it happened this way, you must be right because I really don't remember." As to the written statement executed subsequent to the polygraph interview, defendant testified that the officers had requested him to write down what they had gone over, to "make a written statement and it will help you to remember." He also testified that at the time he made the written statement, he was in fear he would be institutionalized because the polygraph operator had allegedly told him "we can't have you walking around society being able to do something like this and not remember."

The testimony of the officers who had participated in the polygraph exam and surrounding conversations indicated that defendant had indeed qualified many of his statements with the

- 7 -

explanation that "if you say it had to happen that way, that is probably the way it happened." The officers also recalled that a remark had been made to defendant about possibly sending him to Warm Springs for an evaluation. They maintained, however, that defendant was never told he would be institutionalized if he did not cooperate. Their testimony was unclear as to whether the remark was made to defendant before or after he executed the written statement.

Concerning the contents of the written statement, the polygraph examiner testified at one point that he was satisfied it contained the same statements defendant had made orally in the conversations surrounding and involved in the polygraph interview. He later contradicted that testimony, saying that the written statement contained only some, but not all, of the oral admissions.

On the issue of whether the officers suggested to defendant how the events must have transpired, the testimony indicates that some such suggestion occurred. It was also admitted that the final sentence in defendant's written statement was added at the specific request of one of the officers. The officer who made the request testified that he did so because "it had been one of the statements" defendant made during the conversation and "I just wanted him to put it on the statement."

On October 11, 1978, the District Court entered findings of fact and conclusions of law and an order granting defendant's motion to suppress on the grounds that the State, under the totality of the circumstances present here, had failed to prove that defendant's statements were voluntary. The State moved for reconsideration or rehearing. The State's motion was denied and this appeal followed.

The only issue we are asked to resolve is whether the District Court abused its discretion in granting the motion to suppress;

- 8 -

that is, whether there was insufficient evidence to support the findings and conclusions that defendant's admissions (if, indeed, the statements he made can even be characterized as such) were not voluntary.

There are two recent Montana cases containing extended discussion of the principles that control here: State v. Smith (1974), 164 Mont. 334, 523 P.2d 1395, and State v. Lenon (1977), ____Mont.____, 570 P.2d 901, 34 St.Rep. 1153.

> "When a motion to suppress [statements and admissions] is presented to a trial court, its analysis of the evidence presented at the pretrial hearing must focus on whether impermissible procedures were followed by law enforcement authorities. The burden of proof of voluntariness is upon the State, and it is required to prove voluntariness by a preponderance of the evidence but not beyond a reasonable doubt. [Citations omitted.]" Smith, 164 Mont. at 338, 523 P.2d at 1397.

> " . . . The issue of voluntariness of a confession is largely a factual determination, addressed to the discretion of the trial court . . . The trial court's judgment as to voluntariness of a confession will not be reversed on appeal unless it is clearly against the weight of the evidence. [Citations omitted.]" Lenon, 570 P.2d at 906, 34 St.Rep. at 1157-1158.

> " . . . The question of voluntariness largely depends upon the facts of each case, no single fact being dispositive . . . The determination of voluntariness, rather, depends upon the 'totality of the circumstances.' [Citations omitted.]" Lenon, 570 P.2d at 906, 34 St.Rep. at 1157.

If there is substantial credible evidence to support a District Court's findings and conclusions that a confession or admission was involuntary, an order suppressing the evidence must be affirmed. Smith, supra.

There are numerous other Montana decisions cited in the parties' briefs which address either specifically or peripherally the issues involved here. See State v. Chappel (1967), 149 Mont. 114, 423 P.2d 47; State v. White (1965), 146 Mont. 226, 405 P.2d 761; State v. Zachmeier (1968), 151 Mont. 256, 441 P.2d 737. These cases, however, are incorporated either implicitly or by

specific citation in Smith, supra, or Lenon, supra, so any extended discussion of them would add nothing to the controlling principles set forth above. Smith and Lenon make it clear that the standard to be applied by the trial judge on a suppression question is "preponderance of the evidence," but when the same question comes to us on appeal the credibility of the witnesses and the weight to be given their testimony is for the trial court's determination and our review is limited to determining whether there is substantial credible evidence supporting the District Court's findings.

The focus of the findings and conclusions entered in support of the suppression order here was on the downplaying of defendant's Miranda rights and the continued assurances by the investigating officers that he was not a suspect of a crime. Those were the primary elements supporting the District Court's conclusion that the State had not sustained its burden of proving that defendant had waived his constitutional right to counsel, his right against self-incrimination, and that his statements were voluntary. We agree with the District Court that mere lip service was given to the Miranda requirements here, rather than a meaningful warning.

The inadequate Miranda warning, however, was not the only incident of improper procedure by the law enforcement authorities recognized by the District Court. In addition, numerous other questionable tactics are implicitly criticized in the findings and conclusions. The repeated suggestions by the officers that the shooting had to have happened in a particular way; the addition of a sentence to defendant's written statement at the specific request of one of the officers; the variation between defendant's alleged oral admissions and the written statement supposedly embodying the oral discussion, and the threat of incarceration in a mental institution (regardless of whether actually implied by the officer or only inferred by defendant from

the officer's remark) all were part of the totality of the circumstances weighed by the District Court. When taken together they provide substantial credible evidence supporting the findings and conclusions of the District Court.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

- 11 -