MR. JUSTICE SHEEHY
dissenting:
This is the kind of case that is guaranteed to add gray hairs to an already graying judge’s head. The record discloses a strong possibility that defendant Larry Lynn Blakney is guilty of deliberate homicide in the murder of Ann Thibodeau. But the record also discloses a strong possibility that the confession uttered by Larry Lynn Blakney was involuntary, was obtained with indicia of coercion, and the District Court put the burden of proof with respect to voluntariness upon the wrong party at the suppression hearing. Reversal means further expense to the county and a possible loss of a conviction. Affirmance means that Blakney’s constitutional rights must be explained away, and places our approval on the procedure that led to the confession. Therefore, I come down on the side of reversal.
The circumstances surrounding the confession need some further elaboration. The body of Ann Thibodeau was found at approximately 9:00 p.m. on Saturday, June 11, 1977 in the Clark Fork River, near downtown Missoula. Blakney, at the officer’s request, went to the Missoula police station at 10:30 p.m. that evening. He was interrogated beginning at approximately 11:30 p.m. for one and one-half hours. Following the interrogation, which was recorded, Blakney was taken to his home by interrogating officers, where his car was searched pursuant to his consent. They also were shown the interior of Blakney’s home. They broke off contact with him at 2:00 a.m. on the morning of June 12, 1977. Arrangements were made at that time for Blakney to come into the police station that morning at approximately 9:45 a.m. for a second interview.
This second interview on June 12, 1977, lasted approximately two to two and one-half hours. Again the interrogation was conducted in the police interrogation room in the presence of two police officers. At this interrogation arrangements were made for Blakney to take a polygraph examination on the following day at a time to be agreed upon. Although the testimony of the officers is inconsistent about the matter, it is conceded by the two officers and it *485 was found by the trial court that some type of request for an attorney was made by Blakney during the interrogation of June 12.
On Monday, June 13, 1977, Blakney went to the police interrogation room to undergo the polygraph examination. It was conducted by a Cascade County deputy. The examination commenced at approximately 9:15 p.m. and was conducted in the presence of four police officers, including the polygraph examiner. Since Blakney’s father had gone on vacation the previous day, his uncle came to the police station with him. When the polygraph examination began, the uncle was seated at an open door outside the interrogation room and was able to hear the first few questions of the polygraph examination. The examiner shook his head in the negative, said something to another police officer, who then suggested to the uncle that he remove himself, or go upstairs to get a soft drink or something. The uncle did this, and when he attempted to return to the interrogation room, found the door to the basement, through which he had come, locked. He waited there until the polygraph interrogation was completed at which time an officer came out to the uncle to tell him that the boy “was confessing.” During the polygraph examination, the young defendant was seated facing the wall, and on the table near him were spread out parts of the police file, but particularly a dozen or so pictures of the nude body of Ann Thibodeau. When the polygraph examiner had finished his examination, he removed the chart from the machine, and placed the defendant behind him, showed to the defendant, the polygraph chart recording of a “known lie.” The examiner then went on to state by showing other “highs” in the chart, that Blakney was lying. Blakney testified that the polygraph examiner said “well, I’ve got some daughters of my own, I wouldn’t want the same thing to happen to them as what happened to Ann.” Blakney also testified that the examiner told him that the examiner would take the polygraph test and flash it up on a big screen in front of the jury and would show the jury the places where the examiner maintained that Blakney lied.
The testimony of the polygraph examiner in this regard is as follows:
*486 “Q. After Larry came over and you reviewed the results, did you make any statements to Larry at that time? A. Yes, I did. I told him I thought it would probably be best if he leveled with the authorities and told them what happened.
“Q. Are you married? A. Yes.
“Q. Do you have any children? A. Yes.
“Q. And are they boys or girls? A. I have two boys, one 19 and one 16.
“Q. No girls? A. No.
“Q. Did you make a statement to Larry at that time that you had a couple of daughters and you didn’t want this happening to them? A. Okay. To clarify what I am talking about — and talking about marriage — on my first marriage, I have two sons by my first marriage. On my second marriage, I have two daughters, stepdaughters, and that’s true.
“Q. Did you make a statement to that effect, that you knew he was lying and that you didn’t want this to happen to your daughters? A. I’m not going to say that I made that statement. I honestly don’t remember.
“Q. Can you honestly say that you did not make the statement? A. No. I wouldn’t honestly say that.
“Q. Did you make any other statements to him? A. Yes, I did. Before we first started the exam, when we went over the advisement of rights, and also the waiver of rights on the bottom, made it very plain to Larry, and asked him if he knew that this was being done voluntarily on his part, and that the polygraph results cannot be used against him in the State of Montana.
“Q. Did you make a statement to Larry after the test was concluded of something to the effect that you were going to put the results of the test on a screen and have it shown to a jury and he would be found guilty of deliberate homicide? A. No.
“Q. Did you make any statement that was similar to that? A. To the best of my knowledge, no.
“Q. Did you make any other statement, other than possibly one *487 about the daughters, concerning either the use of the results or Larry’s involvement in the crime? A. Yes, I probably did, because in most cases, I’ll tell you then that, if it is stipulated that the results can be used, but only if his attorney and the prosecuting attorneys will stipulate it, that the results can be used.”
Immediately following this, the two officers who originally interrogated Blakney came back into the room. Blakney testified that they told him they knew that he did it and that he ought to tell everything. At this point, Blakney testified that he again requested an attorney. The officers testified that he made such a request but that then he went on talking and so nothing further was done about it. Blakney testified that he assumed that because they continued interrogating him that he was not going to get an attorney at that time.
At this point, according to the testimony of the officers, Blakney, who was concerned about what a confession would mean to members of his family, was assured that it was a good thing for him to do and that the family would understand. With that, Blakney confessed to the murder. Later he gave a further confession that was taped or recorded.
The evidence concerning the actual confession reveals a very emotional scene. It is this evidence and testimony that leads me to conclude that Blakney probably committed the murder. But the testimony in evidence leading up to the confession also forces me to conclude that his constitutional rights against self-incrimination and his right to counsel were overridden.
Of course, if the first real confession was unconstitutionally brought about, then the second confession is likewise inadmissible. In any event, in considering the voluntariness of a confession, its truth or falsity is not to be considered. State v. White (1965), 146 Mont. 226, 405 P.2d 761; cert. den. 384 U.S. 1023, 86 S.Ct. 1955, 16 L.Ed.2d 1026. Where a confession is given in the absence of counsel, the underlying test of admissibility of confession is whether it is given voluntarily, and with the defendant’s free will. *488 State v. Lucero (1968), 151 Mont. 531, 445 P.2d 731; State v. Noble (1963), 142 Mont. 284, 394 P.2d 504.
The majority opinion tacitly concedes that the evidence respecting voluntariness is close, and that there is evidence which would support either side of the issue. It is further clear from the record, that the District Court assumed that it was bound by the provisions of section 46-13-301(4), MCA, that the “burden of proving that a confession or admission was involuntary shall be on the defendant.” This is the first case where the Montana Supreme Court directly invalidates that portion of section 46-13-301(4), MCA. This Court had, however, in State v. Smith (1974), 164 Mont. 334, 338, 523 P.2d 1395, stated that the rule in Montana was that the state must prove the voluntariness of a confession by a preponderance of the evidence. This rule was also enunciated in State v. LaFreniere (1973), 163 Mont. 21, 27, 515 P.2d 76.
The majority opinion concludes that the District Court did in fact apply an incorrect standard by placing the burden of proof upon Blakney to prove the involuntariness of his confession. Having so concluded, the majority goes further and determines that the mistake of the District Court constituted harmless error beyond a reasonable doubt. On that point, I must disassociate myself from the majority.
I cannot agree with the majority that the evidence of voluntariness was harmless beyond a reasonable doubt. I am not mentally agile enough to make that syllogistic leap. In my opinion, when the District Court concluded that Blakney did not carry his burden of proof, a burden he did not have under a correct version of the law, the District Court committed error beyond a reasonable doubt.
To clarify my position, I find no particular significance or error in the fact that Blakney was required to put his evidence on first at the suppression hearing. The correct procedure at suppression hearings calls for the defendant to put his case on first, at least to establish a prima facie case of involuntariness, because otherwise his motion would be defeated if no evidence were given on either side. Once the prima facie case has been established the burden of *489 persuasion shifts to the State to prove the voluntary character of the confession.
I also want to make clear that I have stated the rule in Montana that voluntariness must be proved by the State by a preponderance of the evidence, only because the rule is stare decisis. I disagree with the holding of this Court in State v. LaFreniere, supra, which refused to adopt the standard of proof respecting voluntariness as beyond a reasonable doubt. Our court was following a decision in Lego v. Twomey (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, 626, 627. There, the United States Supreme Court decided that proof beyond a reasonable doubt of the voluntariness of a confession was not constitutionally required. When the logic of the nine men in Washington in reaching a decision does not hold water, and we are not bound by the decision, we should not follow it blindly. The United States Supreme Court reached the preponderance rule in such cases upon the reasoning that “the purpose that a voluntariness hearing is designed to serve has nothing whatever to do with improving the reliability of jury verdicts . . .” 404 U.S. at 486, 92 S.Ct. at 625. That reasoning is demonstrably wrong; it is precisely to assure the reliability of the jury verdict that suppression hearings are permitted. In fact, before the jury is permitted to hear a confession, the trial court is first required to determine that the confession is in fact voluntary. Jackson v. Denno (1964), 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d908. In Montana, by statute, the issue of the admissibility of the confession is not to be submitted to the jury. Section 46-13-301(5), MCA. When one considers that every element of the crime must be proved beyond a reasonable doubt (section 26-1-403(2), MCA) the catastrophic effect of permitting a jury to hear a confession of the defendant, the admissibility of which is determined on a basis less than beyond a reasonable doubt, cannot be debated. California has moved away from the United States Supreme Court in this regard, and has held that the privilege against self-incrimination is so fundamental, and so highly regarded judicially, that the reasonable doubt standard presents the greatest chance of excluding involuntary confessions. *490 People v. Jimenez (1978), 21 Cal.3d 595, 147 Cal.Rptr. 172, 580 P.2d 672.
Persuasive to the California court was the fact that once a confession is determined by the trial court to be voluntary and therefore admissible, the jury does not redetermine the voluntariness issue, and the appellate court is bound to accept the trial court’s resolution of conflicting evidence, unless it is so improbable as to be entirely unworthy of belief. Jimenez, supra, 147 Cal.Rptr. at 178, 580 P.2d at 678. The same situation exists in Montana. Under our code section above cited, the jury does not determine the issue of admissibility. On appeal this Court has held invariably that the District Court’s decision as to admissibility is practically inviolate. State v. Smith (1974), 164 Mont. 334, 523 P.2d 1395; State v. Chappell (1967), 149 Mont. 114, 423 P.2d 47; State v. White (1965), 146 Mont. 226, 405 P.2d 761. Again, it offends my syllogistic power to find consistency in a rule which requires proof of elements of a crime beyond a reasonable doubt but which allows a confession, against the defendant’s constitutional right of no self-incrimination, to be proved by a lesser standard.
Finally, it is my conclusion that Blakney was denied his Miranda rights with respect to counsel. The majority opinion finds that he effectively asserted his right but that he waived the same. It is true that the United States Supreme Court has held that the State bears a “heavy burden” to show waiver of right to counsel. North Carolina v. Butler (1979), 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286, 292. I am frank to state that I don’t know what a “heavy burden” is but I think it should be nothing less than beyond a reasonable doubt. Here again that standard has not been met in this case.
I would reverse and remand, at least for a proper hearing as to the voluntariness of the confession.