No. 14534

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

LARRY L. BLAKNEY,

Defendant and Appellant.

_____

Appeal from: District Court of the Fourth Judicial District,
Honorable Jack L. Green, Judge presiding.

Counsel of Record:

For Appellant:

Smith, Connor & Van Valkenburg, Missoula, Montana
John P. Connor argued, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mary B. Troland argued, Assistant Attorney General,
Helena, Montana
Robert L. Deschamps III, County Attorney, argued,
Missoula, Montana

_____

Submitted: September 13, 1979

Decided: DEC 13 1979

Filed: DEC 13 1979

_Thomas J. Kearney_
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant-appellant was arrested on the charge of deliberate homicide on June 14, 1977, after police had obtained a confession, the product of several interrogations. Appellant thereafter moved to suppress the confession because it was involuntary. The District Court, however, found the confession voluntary, denied the motion, and set trial in the matter. Appellant was convicted of the charge and sentenced to forty years in the Montana state prison. From this conviction he appeals.

At approximately 9:00 p.m. on Saturday, June 11, 1977, police found the body of Ann Thibodeau in the Clark Fork River near the downtown area of Missoula, Montana. Ms. Thibodeau had apparently been strangled and thrown into the river, her death resulting from strangulation aggravated by the ingestion of water into the lungs. On investigation police learned that Ms. Thibodeau spent the evening of June 10, 1977, with appellant and several other young people. During the evening, they drove around Missoula in appellant's car, stopping at various times to pick up some hidden beer, to "park," and to check on some parties.

As the night progressed, appellant took his passengers home, dropping off the last one except Ann Thibodeau shortly before midnight. At trial, as well as when first interviewed by the police, appellant testified he then took Ms. Thibodeau home. In a confession made to Missoula police, however, appellant stated he and Ms. Thibodeau parked by a bridge near the Clark Fork River after dropping off the last of their companions. Appellant said he became angry with Ms. Thibodeau for being unfaithful to his brother, whom she

-2-

had been dating, and suddenly strangled her. Thinking she was dead, he dragged her from his car and slid her off the bridge into the river.

Officers questioned appellant concerning Ms. Thibodeau's death on four occasions: Saturday, June 11, at 11:00 p.m. for approximately one and one-half hours; Sunday, June 12, at 9:30 a.m. for approximately two and one-half hours; Monday, June 13, at 10:00 p.m. for approximately two hours; and Tuesday, June 14, at 12:10 a.m. for approximately one and one-half hours. In addition to these interrogations, appellant consented to a search of his car and a polygraph examination. Officers conducted the car search after the first interrogation at approximately 1:00 a.m. on Sunday, June 12. The search revealed appellant's car had been recently cleaned. The polygraph examination was conducted on Monday, June 13, between the second and third questioning sessions. The examination indicated some untruthfulness in appellant's prior statements. Appellant confessed during the third interview. The fourth interview consisted of a taping of essentially the same confession.

Prior to each interview, appellant was advised of his rights and signed waivers respecting his rights. During the interviews, pictures of the nude body of the victim were exposed on the table of the interrogation room. The interviews were conducted with only appellant and the interviewing officers present in the room. Members of appellant's family were present in the hall outside the interview room. Appellant was not confined between interviews.

Appellant was 18 years of age at the time of the interviews. At the suppression hearing, two expert witnesses testified appellant had a learning disability and probably

could not understand his rights as presented on the waiver forms used by the police. There was additional testimony that appellant had an IQ of 94, had completed the eighth grade, had passed most of the high school equivalency exam, had taken vo-tech classes in Butte, and had worked in his father's business.

Discrepancies exist as to whether appellant made a request for counsel. It is agreed that appellant brought up the subject of counsel during at least one of the questioning sessions. The testimony conflicts, however, as to when appellant mentioned an attorney, what appellant said about wanting an attorney, and the conduct of the interviewers and appellant after the mentioning of counsel.

Appellant states he requested counsel and one was not provided. One of the officers questioning appellant recalled that appellant asked him if he thought he should talk with a lawyer and the officer responded that it was up to appellant. Both questioning officers agree that appellant voluntarily resumed the interview after the mentioning of counsel. No counsel was provided for the appellant during the interrogation process.

On Wednesday, June 15, 1977, appellant called police officers and family members to the Missoula County jail where he was being held and repudiated the statements he had made on the 13th and 14th, stating he saw someone else murder Ms. Thibodeau. At the suppression hearing and trial, appellant withdrew this repudiation and returned to his original story of dropping off the victim at her home about midnight.

Appellant raises three issues on appeal:

-4-

1. Did the District Court err in failing to grant the motion to suppress appellant's confession?

2. Does section 46-13-301(4), MCA, requiring a defendant on a motion to suppress to prove that a confession was involuntary, constitute a denial of due process in violation of the United States and Montana Constitutions?

3. Did the State present sufficient evidence during the trial to support a guilty verdict on the charge of deliberate homicide?

To resolve the first issue presented here, we must decide if the District Court erred in finding appellant's confession voluntary and if appellant was unconstitutionally denied his right to counsel. To determine the first aspect of this issue, the voluntariness of the confession, we must consider the "totality of circumstances" surrounding the confession with no single fact being dispositive of the issue. State v. Grimestad (1979), ___ Mont. ____, 598 P.2d 198, 202, 36 St.Rep. 1245, 1251; State v. Lenon (1977), ____ Mont. ____, 570 P.2d 901, 906, 34 St.Rep. 1153, 1157. When, as here, a youthful defendant questions the voluntariness of a confession, the circumstances the Court must consider include:

> ". . . 1) age of the accused; 2) education of the accused; 3) knowledge of the accused as to both the substance of the charge, if any has been filed, and the nature of his rights to consult with an attorney and remain silent; 4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; 5) whether the accused was inter-rogated before or after formal charges had been filed; 6) methods used in interrogation; 7) length of interrogations; 8) whether vel non the accused refused to voluntarily give statements on prior occasions; and 9) whether the accused has repudiated an extra judicial statement at a later date . . ." West v. United States (5th Cir. 1968), 399 F.2d 467, 469, cert. denied, 393 U.S. 1102.

We should also consider the mental capacity of the defendant, Smallwood v. Warden, Maryland Penitentiary (4th Cir. 1966), 367 F.2d 945, cert. denied, 386 U.S. 1022; the visibility of nude pictures of a murder victim during the defendant's interrogation, People v. Roberts (1966), 3 Mich.App. 605, 143 N.W.2d 182, 185; the use of polygraph examinations, Keiper v. Cupp (9th Cir. 1975), 509 F.2d 238, 241; a defendant's previous experience with the criminal justice system, United States v. Glasgow (9th Cir. 1971), 451 F.2d 557, 558; and, a defendant's experience in the adult world, United States v. Hilliker (9th Cir. 1970), 436 F.2d 101, 102-03, cert. denied, 401 U.S. 958 and West v. United States, supra. These are all factors courts have taken into account in deciding if a young person voluntarily confessed.

One additional rule aids us in deciding this case. We stated in Grimestad:

> ". . . The issue of voluntariness of a confession is largely a factual determination, addressed to the discretion of the trial court . . . The trial court's judgment as to voluntariness of a confession will not be reversed on appeal unless it is clearly against the weight of the evidence." 598 P.2d at 202, quoted from State v. Lenon, 570 P.2d at 906.

The trial court here reviewed the evidence and determined appellant voluntarily confessed. In considering almost every one of the factors listed above as relevant in determining the voluntariness of appellant's confession, evidence exists supporting the holding of the District Court.

Appellant was 18, legally an adult. He had passed most of his high school equivalency examination and attended vo-tech school. Appellant's IQ is 94, within the normal adult

range. The trial judge found that appellant demonstrated an understanding of the English language during his courtroom testimony. Appellant had worked in his father's business. Appellant had prior experience with the criminal justice system, having previously been advised of his rights in connection with juvenile matters. The four interrogation sessions lasted only about two hours each and were spread out over several days. Between sessions, appellant went home, free to consult with family members and move about as he pleased. The District Court found that the polygraph procedure did not intimidate appellant. Appellant stated at the suppression hearing that he did not pay much attention to the pictures of the victim left exposed on a table during the questioning. Appellant repudiated his confession, placing blame for the murder on someone else, but later returned to his original story of dropping off the victim at her home.

Although some evidence to the contrary exists, the above facts show the decision of the District Court does not clearly contravene the weight of the evidence. We must, therefore, affirm the District Court's ruling on the voluntariness of appellant's confession.

Speaking to the second aspect of this issue, whether appellant was unconstitutionally denied his right to counsel during the interrogation process, the District Court concluded:

> "That the defendant never made an effective assertion of counsel and in any event thereafter knowingly and intelligently waived the presence of counsel by spontaneously stating he did not want a lawyer and resuming talking to the police."

This conclusion raises two questions for consideration on appeal: (1) Did appellant effectively assert his right to

an attorney? and, (2) if so, did appellant thereafter waive his right to counsel?

In _Miranda_, the Court stated:

"Prior to any questioning, the person must be warned that he has a right to remain silent, that statements he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." (Emphasis added.) Miranda v. Arizona (1966), 384 U.S. 436, 444-45, 16 L.Ed.2d 694, 86 S.Ct. 1602.

Although the witnesses at the suppression hearing gave conflicting testimony concerning the language used by appellant in allegedly asserting his right to counsel, the trial court found that appellant "brought up the subject of an attorney" twice, on the second occasion stating, "maybe I should have an attorney." This language brings appellant's assertion within the "indicates in any manner" language set out in _Miranda_ as the requirement for an effective assertion of the right to counsel. Thus, the District Court erroneously concluded that appellant did not effectively assert his right to counsel.

We must decide, therefore, if the District Court also erred in concluding that appellant waived his right to counsel after an effective assertion of the right. Although the United States Supreme Court has not yet ruled on the issue, see Brewer v. Williams (1977), 430 U.S. 387, 405-06, 97 S.Ct. 1232, 51 L.Ed.2d 427, several of the circuit courts have held a defendant can validly waive the right to counsel after making a request for counsel. United States v. Rodriguez-Gastelum (9th Cir. 1978), 569 F.2d 482, cert. denied,

436 U.S. 919; United States v. Hodge (5th Cir. 1973), 487 F.2d 945. We hold that this view correctly interprets the situation in Montana and adopt this rule. In so doing, we recognize that a waiver of the right to counsel cannot be presumed and that the State bears a heavy burden to show waiver. North Carolina v. Butler (1979), ___ U.S. _____, 99 S.Ct. 1755, 60 L.Ed.2d 286, 292.

Given this standard and the District Court's findings of fact, the District Court did not err in holding appellant waived his right to counsel. The District Court found that the first assertion of the right was made on Sunday morning. After being advised by the police that he could have counsel if he wished, appellant continued answering questions. Thus, appellant voluntarily abandoned his right to counsel at this point and unilaterally resumed the interview without prompting by the interviewing officers. The Sunday interview terminated around noon with no incriminating statements being made by appellant.

The next interrogation session did not begin until Monday evening. Between the interviews more than 30 hours elapsed, including a full business day in which appellant was not detained and was free to consult with family members or an attorney if he wished. Prior to the Monday interrogation, appellant again received his Miranda warnings and signed a waiver. During the questioning session, appellant again asserted his right to counsel. With this, the officers stopped questioning appellant and began to leave the room. Appellant resumed talking to the police and they reminded him he had just said he wanted an attorney. Appellant then stated he did not want a lawyer and the interrogation continued.

These facts--particularly the more than 30-hour time span between the first assertion of the right to counsel and any inculpatory statement, the rereading of his _Miranda_ warnings and the signing of a waiver before any incriminating statement, and the express statement by appellant that he did not want a lawyer--represent a waiver of the right to counsel on the part of appellant.

The law on the second issue raised by appellant is clear. Recent Montana and United States Supreme Court decisions invalidate section 46-13-301(4), MCA. Lego v. Twomey (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618; State v. Smith (1974), 164 Mont. 334, 338, 523 P.2d 1395, 1397. The State must prove the voluntariness of a confession at a suppression hearing by a preponderance of the evidence. If the trial court applied section 46-13-301(4) and required appellant to prove the confession involuntary, it erred.

Error by the trial court cannot be presumed but must be shown by the record. State v. Straight (1959), 136 Mont. 255, 264-65, 347 P.2d 482. Reviewing the record of the suppression hearing, the trial judge heard arguments by the prosecuting attorney that, while at the trial the State must prove voluntariness, the burden to show the police violated appellant's rights rested on appellant at the suppression hearing. Responding to this argument, the judge stated, "Well, it appears to me that what you say is true. Mr. Volinkaty [appellant's attorney], at the trial, if they wish to introduce this at trial, the burden is on the State to prove voluntariness; however, this is a motion to suppress and I think that, since it is your motion, you should proceed at this time."

This record presents the possibility of two errors by the District Court. First, the trial judge could have erred in requiring the appellant to go forward with the evidence. The federal courts have considered this question on several occasions. Speaking to this issue in a case involving the suppression of wiretap evidence, the Fifth Circuit Court stated:

> "(b) Burdens of proof in suppression hearings. It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. [Citations omitted.] Concededly, in some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant. For example, if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search. [Citation omitted.] Or if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination . . . even in those situations, the defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality." United States v. DeLa Fuente (5th Cir. 1977), 548 F.2d 528, 533-534, cert. denied, 431 U.S. 932 and 434 U.S. 954.

In United States v. Crocker (10th Cir. 1975), 510 F.2d 1129, the trial court denied appellant's motion to suppress a confession. On appeal, the appellant contended the trial court at the suppression hearing improperly required her to assume the burden of proof and of going forward with the evidence. The Circuit Court responded to this argument, saying:

> "It is fundamental on a motion to suppress there must be 'a foundation in fact for the legal result.' Rogers v. Richmond, 365 U.S. 534, 546, 81 S.Ct. 735, 742, 5 L.Ed.2d 760 (1961). Logic dictates that a pre-trial Motion to Suppress

filed by an accused does in fact cast the bur-
den upon the movant to present facts necessary
to sustain his position.  [Citation omitted.]"
Crocker, 570 F.2d at 1135.

The court goes on to state:

"While the defendant must first present evidence
in support of his motion to suppress which sa-
tisfies his burden of challenging the legality
of the confession, we have recognized that the
Government must then carry the countervailing
burden of proving a waiver of the constitutional
privilege against self-incrimination."  510 F.2d
at 1135.

See also United States v. Polizzi (9th Cir. 1974), 500 F.2d

856, 910, cert. denied, 419 U.S. 1120.

These cases indicate a trial judge can properly require

a party moving for the suppression of evidence to initiate

suppression hearing proceedings.  The rationale for such a

procedure is the requirement that the movant establish a

prima facie case that a constitutional infringement has oc-

curred.  Once this has been accomplished, the ultimate

burden of proving the propriety of the state's action shifts

to the state.  Thus the District Court here did not err in

requiring appellant to present his evidence first at the

suppression hearing.

Although allowable, we do not recommend this procedure

as standard practice at suppression hearings.  The District

Courts should employ this procedure only when necessary to

establish a prima facie case of infringement by the State.

If a prima facie case is presented by the party requesting

the suppression of evidence to the trial court's satisfac-

tion through prehearing documentation, the State should be

required to initiate the suppression hearing proceedings.

This procedure will clearly place the burden of proof on the

State as required by Lego and Smith.

The second possible error presented here is whether there was an improper burden of proof put on appellant at the suppression hearing. The above excerpt from the hearing transcript clearly shows the trial judge applied the incorrect standard at the suppression hearing. After hearing the State's argument that appellant was required to prove the confession involuntary, the judge stated he thought that what the prosecuting attorney said was true and required appellant to proceed. As noted above, we find that this required appellant to assume the obligation of going forward with the evidence. It also shifted the burden of proof to appellant.

However, we find here that even though the trial court's ruling did shift the burden, the ruling can be sustained as harmless error. The error here is federal constitutional error. Lego v. Twomey, supra; Jackson v. Denno (1964), 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. While not all errors of constitutional magnitude call for reversal, ". . . before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.

In determining the existence of harmless constitutional error, the appellate court considering the question has the task of applying the harmless beyond a reasonable doubt test. Chapman, 386 U.S. at 24; see also Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; Schneble v. Florida (1972), 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340.

Applying this standard to the instant case, we find the error was harmless beyond a reasonable doubt. We are aided

in our decision by the rationale expressed in Rogers v.
United States (5th Cir. 1964), 330 F.2d 535, cert. denied,
379 U.S. 916.   Rogers is another case holding no error
exists in requiring a defendant to initiate suppression
hearing proceedings.   330 F.2d at 542.   In so holding, the
court stated:

> ". . . The burden of producing evidence is never
> crucial unless certain necessary facts in a case
> are not aired.  Here all the salient facts were
> aired.  Few were even in dispute.  The defendant,
> therefore, was not prejudiced by the order in
> which the evidence was presented.  And the dis-
> trict judge allowed defendant's counsel to ex-
> amine all of the witnesses as hostile.  There
> is no prejudicial error in the record." 330
> F.2d at 543.   (Emphasis added.)

As in Rogers, the trial judge heard all the salient
facts at the suppression hearing.  The trial court heard
testimony from eleven witnesses including appellant, appel-
lant's father, the officers who interviewed appellant, the
polygraph examiner, a clinical psychologist, and a learning
disabilities specialist.  The trial judge allowed appellant's
attorney to examine witnesses as adverse in appellant's
initial presentation.  At the conclusion of the appellant's
initial presentation, the State introduced evidence of
voluntariness through its own witnesses.  When the State
rested, the trial court gave appellant the opportunity to
present rebuttal testimony.  Throughout the proceedings,
both sides conducted extensive direct, cross, redirect, and
recross examination of the witnesses.  In addition to the
witness testimony, the trial judge had the benefit of briefs
from appellant and the State on the voluntariness question.

After considering all this testimony and the briefs of
counsel, the trial judge found the confession voluntary.
Given the extensive nature of the proceedings and the full

right of appellant to present his case on this issue, we are convinced beyond a reasonable doubt the trial judge would have reached the same result regardless of the improper placing of the burden of proof on appellant. Any error thus constitutes harmless error and does not warrant returning the case to the trial court.

Appellant's arguments concerning the third issue lack merit. Regarding the sufficiency of evidence to support a guilty verdict, this Court has said:

> "On appeal we examine the evidence to determine whether the verdict is supported by substantial evidence. In doing so, we view the evidence in the light most favorable to the state." State v. Merseal (1975), 167 Mont. 412, 415, 538 P.2d 1366, 1368.

Beyond the confession, the State presented evidence that placed appellant with the victim about three blocks from the scene of the murder near the probable time of the murder. Appellant could not explain his whereabouts at the time the murder probably occurred. Appellant had told his brother, "I think they're going to get me for the murder" before the police even questioned him about the homicide. And, appellant had borrowed his brother's shoes the morning after the murder because his own were wet, even though every witness who was with appellant and the victim on the night of the murder agreed that appellant had not walked near any water. This evidence, when viewed in the light most favorable to the State, as we must do when the State prevails at the trial level, sufficiently supports appellant's conviction on the charge of deliberate homicide.

For the foregoing reasons, we affirm the judgment of the District Court.

_John Conway Harrison_
Justice

-15-

We concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice John C. Sheehy dissents:

This is the kind of case that is guarantied to add gray hairs to an already graying judge's head. The record discloses a strong possibility that defendant Larry Lynn Blakney is guilty of deliberate homicide in the murder of Ann Thibodeau. But the record also discloses a strong possibility that the confession uttered by Larry Lynn Blakney was involuntary, was obtained with indicia of coercion, and the District Court put the burden of proof with respect to voluntariness upon the wrong party at the suppression hearing. Reversal means further expense to the county and a possible loss of a conviction. Affirmance means that Blakney's constitutional rights must be explained away, and places our approval on the procedure that led to the confession. Therefore, I come down on the side of reversal.

The circumstances surrounding the confession need some further elaboration. The body of Ann Thibodeau was found at approximately 9:00 p.m. on Saturday, June 11, 1977 in the Clark Fork River, near downtown Missoula. Blakney, at the officer's request, went to the Missoula police station at 10:30 p.m. that evening. He was interrogated beginning at approximately 11:30 p.m. for one and one-half hours. Following the interrogation, which was recorded, Blakney was taken to his home by interrogating officers, where his car was searched pursuant to his consent. They also were shown the interior of Blakney's home. They broke off contact with him at 2:00 a.m. on the morning of June 12, 1977. Arrangements were made at that time for Blakney to come into the police station that morning at approximately 9:45 a.m. for a second interview.

-17-

This second interview on June 12, 1977, lasted approximately two to two and one-half hours. Again the interrogation was conducted in the police interrogation room in the presence of two police officers. At this interrogation arrangements were made for Blakney to take a polygraph examination on the following day at a time to be agreed upon. Although the testimony of the officers is inconsistent about the matter, it is conceded by the two officers and it was found by the trial court that some type of request for an attorney was made by Blakney during the interrogation of June 12.

On Monday, June 13, 1977, Blakney went to the police interrogation room to undergo the polygraph examination. It was conducted by a Cascade County deputy. The examination commenced at approximately 9:15 p.m. and was conducted in the presence of four police officers, including the polygraph examiner. Since Blakney's father had gone on vacation the previous day, his uncle came to the police station with him. When the polygraph examination began, the uncle was seated at an open door outside the interrogation room and was able to hear the first few questions of the polygraph examination. The examiner shook his head in the negative, said something to another police officer, who then suggested to the uncle that he remove himself, or go upstairs to get a soft drink or something. The uncle did this, and when he attempted to return to the interrogation room, found the door to the basement, through which he had come, locked. He waited there until the polygraph interrogation was completed at which time an officer came out to the uncle to tell him that the boy "was confessing." During the polygraph examination, the young defendant was seated facing the wall, and on the table near

-18-

him were spread out parts of the police file, but particularly a dozen or so pictures of the nude body of Ann Thibodeau. When the polygraph examiner had finished his examination, he removed the chart from the machine, and placed the defendant behind him, showed to the defendant, the polygraph chart recording of a "known lie". The examiner then went on to state by showing other "highs" in the chart, that Blakney was lying. Blakney testified that the polygraph examiner said "well, I've got some daughters of my own, I wouldn't want the same thing to happen to them as what happened to Ann." Blakney also testified that the examiner told him that the examiner would take the polygraph test and flash it up on a big screen in front of the jury and would show the jury the places where the examiner maintained that Blakney lied.

The testimony of the polygraph examiner in this regard is as follows:

"Q. After Larry came over and you reviewed the results, did you make any statements to Larry at that time? A. Yes, I did. I told him I thought it would probably be best if he leveled with the authorities and told them what happened.

"Q. Are you married? A. Yes.

"Q. Do you have any children? A. Yes.

"Q. And are they boys or girls? A. I have two boys, one 19 and one 16.

"Q. No girls? A. No.

"Q. Did you make a statement to Larry at that time that you had a couple of daughters and you didn't want this happening to them? A. Okay. To clarify what I am talking about -- and talking about marriage -- on my first marriage, I have two sons by my first marriage. On my second marriage, I have two daughters, stepdaughters, and that's true.

-19-

"Q. Did you make a statement to that effect, that you knew he was lying and that you didn't want this to happen to your daughters? A. I'm not going to say that I made that statement. I honestly don't remember.

"Q. Can you honestly say that you did not make the statement? A. No. I wouldn't honestly say that.

"Q. Did you make any other statements to him? A. Yes, I did. Before we first started the exam, when we went over the advisement of rights, and also the waiver of rights on the bottom, made it very plain to Larry, and asked him if he knew that this was being done voluntarily on his part, and that the polygraph results cannot be used against him in the State of Montana.

"Q. Did you make a statement to Larry after the test was concluded of something to the effect that you were going to put the results of the test on a screen and have it shown to a jury and he would be found guilty of deliberate homicide? A. No.

"Q. Did you make any statement that was similar to that? A. To the best of my knowledge, no.

"Q. Did you make any other statement, other than possibly one about the daughters, concerning either the use of the results or Larry's involvement in the crime? A. Yes, I probably did, because in most cases, I'll tell them that, if it is stipulated that the results can be used, but only if his attorney and the prosecuting attorneys will stipulate it, that the results can be used."

Immediately following this, the two officers who originally interrogated Blakney came back into the room. Blakney testified that they told him they knew that he did it and that he ought to tell everything. At this point, Blakney testified that he again requested an attorney. The officers testified that he made such a request but that then he went on talking and so nothing further was done about it. Blakney testified that he assumed that because they continued interrogating him that he was not going to get an attorney at that time.

At this point, according to the testimony of the officers, Blakney, who was concerned about what a confession would mean to members of his family, was assured that it was a good thing for him to do and that the family would understand. With that, Blakney confessed to the murder. Later he gave a further confession that was taped or recorded.

The evidence concerning the actual confession reveals a very emotional scene. It is this evidence and testimony that leads me to conclude that Blakney probably committed the murder. But the testimony in evidence leading up to the confession also forces me to conclude that his constitutional rights against self-incrimination and his right to counsel were overridden.

Of course, if the first oral confession was uncon-stitutionally brought about, then the second confession is likewise inadmissible. In any event, in considering the voluntariness of a confession, its truth or falsity is not to be considered. State v. White (1965), 146 Mont. 226, 405 P.2d 761; cert.den. 384 U.S. 1023, 86 S.Ct. 1955, 16 L.Ed.2d 1026. Where a confession is given in the absence of counsel, the underlying test of admissibility of confession is whether it is given voluntarily, and with the defendant's free will. State v. Lucero (1968), 151 Mont. 531, 445 P.2d 731; State v. Noble (1963), 142 Mont. 284, 394 P.2d 504.

The majority opinion tacitly concedes that the evidence respecting voluntariness is close, and that there is evidence which would support either side of the issue. It is further clear from the record, that the District Court assumed that it was bound by the provisions of section 43-13-302(4), MCA, that the "burden of proving that a confession or admission was involuntary shall be on the defendant." This is the first

-21-

case where the Montana Supreme Court directly invalidates that portion of section 46-13-301(4), MCA.  This Court had, however, in State v. Smith (1974), 164 Mont. 334, 338, 523 P.2d 1395, stated that the rule in Montana was that the state must prove the voluntariness of a confession by a preponderance of the evidence.  This rule was also enunciated in State v. LaFreniere (1973), 163 Mont. 21, 27, 515 P.2d 76.

The majority opinion concludes that the District Court did in fact apply an incorrect standard by placing the burden of proof upon Blakney to prove the involuntariness of his confession.  Having so concluded, the majority goes further and determines that the mistake of the District Court constituted harmless error beyond a reasonable doubt. On that point, I must dissociate myself from the majority.

I cannot agree with the majority that the evidence of voluntariness was harmless beyond a reasonable doubt.  I am not mentally agile enough to make that syllogistic leap.  In my opinion, when the District Court concluded that Blakney did not carry his burden of proof, a burden he did not have under a correct version of the law, the District Court committed error beyond a reasonable doubt.

To clarify my position, I find no particular significance or error in the fact that Blakney was required to put his evidence on first at the suppression hearing. The correct procedure at suppression hearings calls for the defendant to put his case on first, at least to establish a _prima_ _facie_ case of involuntariness, because otherwise his motion would be defeated if no evidence were given on either side.  Once the _prima_ _facie_ case has been established the burden of persuasion shifts to the State to prove the voluntary character of the confession.

-22-

I also want to make clear that I have stated the rule in Montana that voluntariness must be proved by the State by a preponderance of the evidence, only because the rule is stare decisis. I disagree with the holding of this Court in State v. LaFreniere, supra, which refused to adopt the standard of proof respecting voluntariness as beyond a reasonable doubt. Our court was following a decision in Lego v. Twomey (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, 626, 627. There, the United States Supreme Court decided that proof beyond a reasonable doubt of the voluntariness of a confession was not constitutionally required. When the logic of the nine men in Washington in reaching a decision does not hold water, and we are not bound by the decision, we should not follow it blindly. The United States Supreme Court reached the preponderance rule in such cases upon the reasoning that "the purpose that a voluntariness hearing is designed to serve has nothing whatever to do with improving the reliability of jury verdicts . . ." 404 U.S. at 486. That reasoning is demonstrably wrong; it is precisely to assure the reliability of the jury verdict that suppression hearings are permitted. In fact, before the jury is permitted to hear a confession, the trial court is first required to determine that the confession is in fact voluntary. Jackson v. Denno (1964), 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. In Montana, by statute, the issue of the admissibility of the confession is not to be submitted to the jury. Section 46-13-301(5), MCA. When one considers that every element of the crime must be proved beyond a reasonable doubt (section 26-1-403(2), MCA) the catastrophic effect of permitting a jury to hear a confession of the defendant,

-23-

the admissibility of which is determined on a basis less than beyond a reasonable doubt, cannot be debated. California has moved away from the United States Supreme Court in this regard, and has held that the privilege against self-incrimination is so fundamental, and so highly regarded judicially, that the reasonable doubt standard presents the greatest chance of excluding involuntary confessions. People v. Jimenez (1978), 147 Cal.Rptr. 172, 580 P.2d 672.

Persuasive to the California court was the fact that once a confession is determined by the trial court to be voluntary and therefore admissible, the jury does not redetermine the voluntariness issue, and the appellate court is bound to accept the trial court's resolution of conflicting evidence, unless it is so improbable as to be entirely unworthy of belief. Jimenez, supra, 580 P.2d at 678. The same situation exists in Montana. Under our code section above cited, the jury does not determine the issue of admissibility. On appeal this Court has held invariably that the District Court's decision as to admissibility is practically inviolate. State v. Smith (1974), 164 Mont. 334, 523 P.2d 1395; State v. Chappell (1967), 149 Mont. 114, 423 P.2d 47; State v. White (1965), 146 Mont. 226, 405 P.2d 761. Again, it offends my syllogistic power to find consistency in a rule which requires proof of elements of a crime beyond a reasonable doubt but which allows a confession, against the defendant's constitutional right of no self-incrimination, to be proved by a lesser standard.

Finally, it is my conclusion that Blakney was denied his Miranda rights with respect to counsel. The majority opinion finds that he effectively asserted his right but that he waived the same. It is true that the United States Supreme Court has held that the State bears a "heavy burden" to show waiver of right to counsel. North Carolina v. Butler (1979), ___ U.S. _____, 99 S.Ct. 1755, 60 L.Ed.2d 286, 292. I am

-24-

frank to state that I don't know what a "heavy burden" is but I think it should be nothing less than beyond a reasonable doubt. Here again that standard has not been met in this case.

I would reverse and remand, at least for a proper hearing as to the voluntariness of the confession.

————————————————————————————————
                    Justice

Mr. Justice Daniel J. Shea dissenting:

I would reverse the conviction. I cannot in good conscience abide by the bald conclusion of the trial court after a hearing on a motion to suppress, that the confession was voluntary and that defendant was not denied his right to counsel.

I agree with the factual recitation and conclusions reached by Justice Sheehy in his dissent, although I am not convinced at this time that we should adopt the California standard that the State must prove beyond a reasonable doubt that a confession is voluntary before it can be introduced against him at trial. People v. Jiminez (1978), 147 Cal.Rptr. 172, 580 P.2d 672. I am not convinced, on the other hand, that the present preponderance of the evidence should be the proper standard. Rather, I believe that the State should be required to prove by clear and convincing evidence that the defendant's confession was voluntary. The standard of beyond a reasonable doubt is too stern, and the standard of preponderance of the evidence is too elusive or vaporous. It is too flexible a standard by which to judge something so fundamental as a constitutional right.

Justice Sheehy does not agree, furthermore, that it was harmless error beyond a reasonable doubt to require the defendant to prove the involuntariness of the confession. Nor do I. Should a defendant challenge the voluntariness of his confession, it is his duty to raise the issue by an appropriate motion to suppress with specific contentions; but once those allegations are made it is the duty of the State to proceed first with its case to prove that the confession was voluntary. Only if the State establishes a prima facie case of voluntariness by the standard of clear and convincing evidence should the defendant be required to come forward with

-26-

his own evidence disputing the State's claim. That was not done here, and regardless of the standard used, it is clear that the trial court in effect placed the burden on the defendant to prove that the confession was involuntary and to prove that he was denied his right to counsel. The record demonstrates that the trial court was under the mistaken assumption it was the defendant's duty to prove involuntariness of the confession and nonwaiver of counsel rather than the duty of the State to prove a voluntary confession and waiver of counsel.

In setting forth the wide latitude to be given a trial court in assessing and weighing the evidence, the majority refers to Grimestad where we simply repeated the time worn rule which applies to virtually all factual determinations by a trial court. The majority then proceeds to apply Grimestad to this case by stating:

> "The trial court here reviewed the evidence
> and determined appellant voluntarily confessed.
> In considering almost every one of the factors
> listed above as relevant in determining the
> voluntariness of appellant's confession, evidence
> exists supporting the holding of the District
> Court."

I do not dispute that evidence exists supporting the holding of the trial court, but if a standard other than the virtually meaningless one of preponderance of the evidence (in the context of this case) were applied, the trial court would have been required to find that the State did not prove the confession voluntary and a waiver of counsel by clear and convincing evidence.

The majority then proceeds to discuss the evidence as to each of the factors. The essential problem is, however, that another trial judge, if he was so inclined (let us say if he had philosophical leanings different than those of

-27-

the trial judge concerning the right to counsel and obtaining confessions), could have taken the opposite position, and concluded, with adequate support in the record, that the State did not prove that the confession was voluntary and that the State did not prove that defendant waived his right to counsel. This decision of the trial court would have looked just as good in print, although not nearly as well accepted by the public.

Viewed in the abstract, this deference given to trial court decisions on the facts is nice-sounding; it gives the distinct impression that the appellate court is not meddling in the factual determinations of the trial court. I would also like to believe that we could, with full assurance, give this kind of deference to the trial court and its fact-finding functions. We refer to this rule constantly when we uphold a decision of the trial court as to its factual determinations.

Aside from the improper standard applied in this case (it should be at least by clear and convincing evidence), the problem in this case is in applying this rule of deference to a situation where there is no indication that the trial court listened carefully to the evidence, carefully evaluated the evidence, and then came to the proper conclusions by a careful application of the law to the facts as it perceived them to be. We are giving only lip service to one's constitutional rights if we do not require this of trial courts in reviewing their rulings on factual questions relating to alleged constitutional violations.

How do we know, for example, that in this case after the motion to suppress was taken under advisement, if the trial court took five minutes in considering the case before reaching its decision, or whether it took fifteen hours in considering

-28-

the case before it reached its decision?  This is not necessarily to say that a five minute consideration would automatically be inadequate or that a fifteen hour consideration would be adequate.  But, it can be safely stated that, regardless of the decision, if one knew the trial court considered the case for fifteen hours before reaching its decision, it would at least indicate that it had carefully considered the case.

It goes without saying that when this Court reviews decisions of a trial court, it is helpful that we know how the trial court perceived the facts if it is making a factual determination, and how it applied the law to the facts.  It is most important when the issue involves a claimed violation of a fundamental right such as is involved here.  Unfortunately, it is more often the case than not, that this Court does not receive any meaningful insight as to how and why a trial court reached a decision.  The general rule seemingly applied by the trial courts is that the less it says about the facts, and how it applied the law to the facts, the better its chance will be that its decision will be upheld on appeal.  That situation exists in this case, but it is much more serious.  Here, the only findings of fact and conclusions of law involved, are those prepared by the County Attorney after the trial court had reached its decision, and which were then given to the trial court to sign.  We perhaps get some insight as to what the prosecutor perceived the facts to be and the appropriate conclusions to draw from those facts, but it adds absolutely nothing to the legitimacy of the trial court's decision.

Had it not been for the after-the-decision suggestion of a law school intern then working for the Missoula County Attorney, there would not have been any findings and conclusions entered in this case.  This important revelation was first unearthed during the oral arguments before this Court.  The prosecutor explained the circumstances.

This Court was questioning the prosecutor as to whether the trial court had entered a memorandum in support of its decision or had entered findings of fact and conclusions of law. In reply, the prosecutor revealed that after the trial court had taken the suppression motion under advisement, it later notified the County Attorney's office that it had entered an order denying the defendant's motion to suppress, or was about to enter such an order. It was then that the law student suggested to the prosecutor that it would be a good idea if the prosecutor presented the trial court with findings and conclusions in support of its order. The prosecutor agreed that this was a wise suggestion and, accordingly, prepared findings and conclusions and presented them to the trial court for signature. The trial court adopted verbatim the findings and conclusions; indeed, the order in which the findings and conclusions appear is exactly the same document presented by the prosecutor. Thus, the only findings and conclusions before this Court for review are those prepared by and tailored by the prosecutor.

The trial court had not requested proposed findings and conclusions from either side. Presumably, therefore, if the trial court did so at all, it was going to prepare and enter its own. At least the defendant would naturally believe this being that the trial court requested no findings or conclusions from either side. Counsel for defendant at the hearing on the motion to suppress is not the same counsel as argued this appeal, and I imagine it will come as quite a revelation to him as to the background leading up to the tailored findings and conclusions signed by the trial court.

The majority, of course, has carried the day, but I would not give one ounce of weight to findings and conclusions

-30-

prepared, presented, and signed in this manner. To conclude, as the majority has, that all this deference should be given to the decision of the trial court in listening to, weighing and evaluation of the evidence, is an exhaltation of form over substance in the highest degree.

Defendant did not have his fair day in court on the motion to suppress because of the trial court's erroneous ruling placing the burden on the defendant. This error was compounded by the strange decision-making process used in this case. Where the findings were tailored by the prosecutor after the decision was made, and with no opportunity for the defendant to participate, how can anyone in good conscience believe that the trial court fairly received and evaluated the evidence and applied the law in a fair and even-handed manner?

Assuming that the revelations of the prosecutor did not come to light during oral arguments, and that this Court believed that the findings and conclusions were those of the trial court alone, if we had a standard of review of questions of this nature requiring the State to prove by clear and convincing evidence rather than by the preponderance of the evidence, the evidence would have required this Court to reverse the District Court. By not adopting a more stringent standard, we are only encouraging trial courts to be as vague as possible in reaching their decisions on questions involving fundamental constitutional rights.

_Daniel J. Shea_
Justice